JUSTICE RICE
concurring in part and dissenting in part.
¶58 I concur with the Court’s holding under Issue 1, and agree that service of process was “fairly and reasonably effectuated.” ¶ 33. However, I dissent from the Court’s decision not to set aside the default judgment, which I believe was entered unfairly and unreasonably under the circumstances-includingmany circumstances which the Court does not mention.
¶59 Upon the filing of the suit, Wagley, located in Louisiana, was given less than an hour notice of the TRO hearing, but nonetheless participated by telephone. Thereafter, frequent telephone and e-mail communications ensued between MPS’s counsel, James Murphy, and Wagley. As the Court notes, these communications included settlement negotiations regarding the merits of the underlying trademark dispute, as well as exchanges about the action pending in Billings. As part of these exchanges, Murphy began forwarding to Wagley the documents being filed in the action, including summons and complaint, TRO application, supporting affidavits, orders and motions. The parties then entered several stipulations whereby the hearings scheduled in the action were postponed and the TRO was extended. However, underneath the surface of these written and oral communications, much more was going on. The record sets forth these events:
¶60 On March 17, Murphy e-mailed Wagley, attaching “an order of Judge Watters extending the TRO and moving the hearing to Monday, April 3, 2006.”
¶61 On March 28, MPS filed the affidavit of service of the summons and complaint upon NIFL. This filing was not sent to Wagley.
¶62 On March 31, Murphy e-mailed Wagley regarding another extension of the TRO and continuance of the hearing, instructing him to submit a letter on NIFL letterhead consenting to a continuance, and *307 also suggesting that he (Murphy) ask Judge Watters “to make the TRO permanent to a trial date.” (Emphasis added.) Wagley responded by faxing the requested letter.
¶63 On April 3, Murphy e-mailed Wagley, advising him that “Judge Watters did not have a problem extending the hearing and set it for April 24, 2006.”
¶64 On April 7, MPS filed a motion for default against the NIFL, but did not provide a copy to Wagley. Further, MPS took the NIFL’s default, which was not forwarded to Wagley.
¶65 On April 21, the parties exchanged e-mails about another extension. Murphy indicated MPS would not agree to further extensions, and that entry of a preliminary injunction was “probably a foregone conclusion,” given that the football season was well -under way. Wagley responded by stating, “That’s fine. I believe the status quo is working out OK at this time.” (Emphasis added.)
¶66 On April 24, the District Court entered a preliminary injunction. Murphy forwarded a copy of the order to Wagley.
¶67 On May 1, MPS filed a motion for default judgment and order setting hearing. These documents were not forwarded to Wagley.
¶68 Also on May 1, Murphy had an ex parte meeting with the district court judge. In addition to not being noticed, the meeting does not appear on the docket or in the District Court files. Murphy’s timesheet describes the meeting: “Meeting with [district court judge] turned into a long visit on notice issue and when it is required; review cases with her; she used several of her own volumes; conclusion is that standard to set aside is higher for both default and judgment; she understands our position and our plan ....”
¶69 On May 24, MPS filed its proposed findings, conclusions and judgment order for the default judgment hearing. The proposed judgment imposed punitive damages against NIFL in the amount of $25,000.
¶70 On June 1, following the hearing, the court’s findings, conclusions and judgment were entered. The judgment enters punitive damages against NIFL in the amount of $100,000.
¶71 While reasonable minds may draw different conclusions from these facts, I am of the view that entry of a default judgment under these circumstances was improper. Although the Court faults NIFL for failing to monitor the litigation, it is clear that Wagley believed he was monitoring the status of the litigation, and MPS gave him every reason to think so, whether intentionally or not. True, Wagley was a lawyer, should have been more attentive to the litigation and should have *308 retained local counsel. However, he understood that the documents filed in the action were being provided to him. Further, Murphy had suggested to him that the TRO be made permanent “until a trial date’-necessarily implying the case would proceed to a trial. Wagley was comfortable with the status quo of the case as he understood it to be, and he expressed this to Murphy.
¶72 Wagley had not a clue that, as he was communicating with Murphy about an extension, MPS was preparing to request that NIFL’s default be taken. Nor did he know thereafter that MPS moved for a default judgment and Murphy had unilaterally met with the judge to advise the court of his “position and plan” for obtaining the judgment. Then, at the default judgment hearing, the punitive damage claim against NIFL which was set forth in MPS’s proposed judgment somehow quadrupled.
¶73 The Court distinguishes the facts in Maulding and reasons that MPS had “no legal duty to reveal” its pursuit of the default judgment. However, I find it notable that, in Maulding, we reversed the default judgment even though plaintiffs counsel “was not required to inform the insurance company of the proceedings "Maulding, 257 Mont. at 26, 847 P.2d at 297. While the judge and counsel in this case were no doubt trying to properly fulfill their individual duties, I believe the facts of this matter nonetheless converged to establish the extraordinary circumstances necessary for relief from the default judgment under M. R. Civ. P. 60(b)(6). As to NIFL, this was an unfair and unreasonable judgment, including an inflated punitive damage award. I would reverse.